UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

OVERLAKE RESIDENCE, LLC,

          Plaintiff,

      v.

TRANSPORTATION INSURANCE
COMPANY, INC.,

          Defendant.

CASE NO. C05-1626JLR

ORDER

## I.  INTRODUCTION

This matter comes before the court on cross-motions for summary judgment (Dkt. ## 11, 15) from Plaintiff Overlake Residence, LLC ("Overlake") and Defendant Transportation Insurance Company, Inc. ("Transportation").  Transportation has requested oral argument; Overlake has not.  The court finds the motions appropriate for disposition on the basis of the parties' briefing and supporting evidence.  As stated below, the court interprets the insurance policy at issue in this action, declines to resolve certain issues, and reserves ruling on other issues pending notification from the parties.

## II.  BACKGROUND

In the late 1990s, two individuals began contracting for the construction of a multi-million dollar residence in Medina, Washington.  Overlake, an entity under the individuals' control, assumed responsibility as the general contractor for the residence.

ORDER – 1

Overlake contracted with Gordon Brown Associates, Inc. ("GBA") for the installation of plaster on the walls of the residence. GBA began installing plaster no later than April 2000, and finished in August 2001.

In February 2001, another company began painting the plaster that GBA had installed. Within a short time after the painting, the plaster began to delaminate from the walls. Eventually, walls in all but eight of the fifty rooms in the residence experienced significant delamination. To repair the damage, Overlake replaced and repainted the plaster and other affected components of the walls at significant expense.

In May 2002, Overlake sued GBA and the painting company in King County Superior Court. Overlake claimed that the damage arose from a combination of GBA's use of an improperly mixed bonding material when installing the plaster and errors in the painting process. GBA sought assistance from Mutual of Enumclaw, the insurer who issued its general commercial liability policy for the one-year period beginning December 1, 2000. Although GBA had a general liability policy from Valley Forge Insurance Company ("Valley Forge) for the one-year period preceding December 1, 2000, as well as an umbrella policy from Transportation for the same period, GBA did not inform either Valley Forge or Transportation of Overlake's lawsuit. Mutual of Enumclaw provided counsel to GBA during the state court lawsuit.

For reasons not apparent from the record, GBA did not inform Transportation or Valley Forge of Overlake's suit until January 2004. On January 22, 2004 counsel for GBA notified GBA's insurance agent of a claim under the Valley Forge and Transportation policies. Armstrong Decl., Ex. 1. The agent relayed the notice to CNA Financial Corporation ("CNA"), the parent company of Valley Forge and Transportation.

On April 23, 2004, Lee Armstrong, a claims specialist at CNA, denied GBA's claim. Armstrong Decl., Ex. 5. The parties dispute whether Mr. Armstrong denied the

ORDER – 2

claim as to both CNA policies, or merely as to the Valley Forge policy.  The court will consider that dispute in its later analysis.  In any event, neither Valley Forge nor Transportation participated in the state court lawsuit.

In late 2004, after an August 2004 mediation, GBA reached a settlement with Overlake.  The parties agreed to a stipulated judgment of $2.5 million, with Mutual of Enumclaw agreeing to pay $1 million.  GBA assigned its rights under the Valley Forge and Transportation policies to Overlake.   The parties moved the state court to make a "reasonableness determination" pursuant to RCW § 4.22.060.  On December 17, 2004, the state court entered an order declaring the settlement reasonable, and dismissed the action.

On August 16, 2005, Overlake sued Transportation in King County Superior Court, seeking a judgment that Transportation was liable for the remaining $1.5 million of the state court judgment in addition to other damages.  Transportation removed the action to this court.

The parties now seek summary judgment as to the interpretation of the Transportation policy, what damages (if any) Overlake can recover under the policy, and whether Transportation violated the Washington Consumer Protection Act ("CPA") and acted in bad faith in handling GBA's claim.

## III.  ANALYSIS

On a motion for summary judgment, the court is constrained to draw all inferences from the admissible evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of showing the absence of a genuine issue of material fact.  Celotex

ORDER – 3

1  Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden,

2  the opposing party must show that there is a genuine issue of fact for trial.  Matsushita

3  Elect. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The opposing party

4  must present significant and probative evidence to support its claim or defense.  Intel

5  Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).  When

6  confronted with purely legal questions, the court does not defer to the non-moving party.

7  **A.   The Court Interprets the Transportation Policy.**

8       The first issue that these motions present is the interpretation of the Transportation

9  policy.  In Washington, insurance policy interpretation is a pure question of law.  Overton

10  v. Consolidated Ins. Co., 38 P.3d 322, 325 (Wash. 2002).  The court must give the terms

11  of the policy a "fair, reasonable, and sensible construction as would be given to the

12  contract by the average person purchasing insurance."  Id. (internal quotation omitted).

13  Terms defined within a policy are to be construed as defined, while undefined terms are

14  given their ordinary meaning.  Boeing Co. v. Aetna Cas. & Sur. Co., 784 P.2d 507, 511

15  (Wash. 1990).

16       If the policy language on its face is fairly susceptible to two different but

17  reasonable interpretations, ambiguity exists, and the court will apply the interpretation

18  most favorable to the insured.  Allstate Ins. Co. v. Peasley, 932 P.2d 1244, 1246 (Wash.

19  1997) (cited in Petersen-Gonzales v. Garcia, 86 P.3d 210 (2004)); Allstate Ins. Co. v.

20  Hammonds, 865 P.2d 560, 562 (Wash. Ct. App. 1994) (ambiguity exists "when, reading

21  the contract as a whole, two reasonable and fair interpretations are possible.").  Absent

22  evidence that the parties negotiated the terms of the insurance policy, a court must

23  construe ambiguity against the insurer "even where the insurer may have intended another

24  meaning."  Allstate, 865 P.2d at 562.

ORDER – 4

When interpreting a policy (like the Transportation policy) that contains coverage clauses and exclusions, the insured bears the burden to establish a "prima facie case giving rise to coverage under the insuring provisions of a policy . . . ." Am. Star Ins. Co. v. Grice, 854 P.2d 622, 625-26 (Wash. 1993). If the insured succeeds, "the burden is then on the insurer to prove that a loss is not covered because of an exclusionary provision in the policy." Id. at 626.

1.    **Overlake's Loss Falls Within the Coverage Clause of the Policy.**

The Transportation policy consists of a brief coverage clause followed by a lengthy assortment of coverage exclusions. Hepburn Decl. Ex. C., Commercial Umbrella Plus Coverage Part ("Policy") at 1-4, Sect. I. In relevant part, the coverage clause states as follows:

> We will pay on behalf of the insured all sums that the insured becomes legally obligated to pay as "ultimate net loss" because of . . . "Property Damage" . . . caused by an "incident" which takes place during the policy period and in the policy territory.

Policy at 1, Sect. I, ¶ 1. There is no dispute that the Overlake residence suffered "Property Damage" within the meaning of the Transportation policy. Policy at 10, Sect. V, ¶ 12 (defining "Property damage").

The parties dispute, however, whether the property damage resulted from an "incident" during the policy period. To resolve that dispute, the court must determine what meaning the policy ascribes to the term "incident." The policy complicates the question, because it addresses the term "incident" differently depending on whether the insured's claim is for primary or secondary coverage. The policy provides secondary coverage for losses that the underlying policy (in this case, the Valley Forge policy) covers, as well as primary coverage for some losses. Overlake has not asserted that the Valley Forge policy covers its losses, so it seeks primary coverage. For primary claims, a

ORDER – 5

subclause of the policy defines an "incident" as "either an occurrence or offense." Policy at 10, Sect. V, ¶ 9(b). The preceding subclause, which addresses claims for secondary coverage, provides a much more elaborate definition. It explains that an "incident" for purposes of property damage "is an occurrence," and that when an "occurrence" triggers coverage, "'incident' means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions, that take [sic] place during the policy period." Policy at 9, Sect. V, ¶ 9(a)(1). Id.[1] Overlake relies on this definition of "incident," Transportation states that it would be improper to do so.

       The court concludes that it makes no difference whether an "incident" is merely an "occurrence," or an "incident" as more elaborately defined in the Transportation policy. In either case, an "incident" took place during the Transportation policy period. If the policy's more elaborate definition of "incident" applies, the bonding material GBA used in installing the plaster created a surface that was bound to delaminate, and GBA therefore created a "harmful condition" at the residence. The walls were continuously exposed to the harmful condition from the time GBA installed plaster on them until the Transportation policy expired in December 2000.[2] If the policy's simpler definition of "incident" applies, then the ordinary meaning of "occurrence" governs. The ordinary

---

[1]Although the court need not resolve the issue, it notes that the policy's definition of "incident" as an "accident" is not limited to occurrences to which secondary coverage applies. At best, the definition's presence in a subclause discussing secondary claims creates an ambiguity over whether the definition applies to primary claims. If it needed to resolve the ambiguity, the court would be bound to resolve it in the manner most favorable to the insured.

[2]Although it is undisputed that GBA began installing plaster at the residence in April 2000 and finished in August 2001, the progress of the installation is not apparent from the record. It is unclear, for example, how many rooms of the residence GBA had plastered by the end of the Transportation policy period in December 2000. For purposes of this motion, the court assumes, consistent with the record before it, that GBA had plastered some of the walls of the residence by the end of the policy period.

ORDER – 6

meaning of the term "occurrence" encompasses accidents.  Yakima Cement Prods. Co. v. Great Am. Ins. Co., 608 P.2d 254, 257 (Wash. 1980).  A subcontractor's unintentional "mismanufacture" of a product is an accident.  DeWitt Const. Inc. v. Charter Oak Fire Ins. Co., 307 F.3d 1127, 1133 (9th Cir. 2002) (applying Washington law and citing Yakima Cement).  Here, when GBA inappropriately mixed the bonding material and used it when it installed plaster, an "occurrence" took place during the policy period.

Because the "property damage" to the Overlake residence resulted from an "incident" that occurred during the policy period, the court concludes that the coverage clause of the Transportation policy applies to Overlake's claim as a matter of law.  That Transportation asserts that damage did not arise until after the policy period[3] is of no consequence.  Some insurance policies condition coverage on damage occurring during the policy period.  See, e.g., Wellbrock v. Assurance Co. of Am., 951 P.2d 367, 369 n.3 (Wash. Ct. App. 1998) ("This insurance applies only to bodily injury and property damage which occurs during the policy period.").  The Transportation policy, by contrast, conditions coverage on property damage caused by an "incident" that takes place during the policy period.  It is the timing of the incident, not the resulting damage, that triggers coverage.

### 2.   Policy Exclusions Apply to Some, But Not All, of Overlake's Losses.

Overlake has satisfied its burden to show that the policy covers its loss; Transportation must now show that exclusions in the policy deprive Overlake of coverage.

---

[3]Overlake concedes that the bulk of the property damage arose after the period of the Transportation policy, but insists that some damage to the plaster itself, as well as damage to electrical fixtures within the walls, occurred during the policy period.  Overlake Mot. at 15.

ORDER – 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### a.    Exclusion 2(j)(6)

Transportation points to an exclusion ("Exclusion 2(j)(6)") for property damage to "[t]hat particular part of any property that must be restored, repaired, or replaced because 'your work' was incorrectly performed on it."  Policy at 3, Sect. I, ¶ 2(j)(6).  Under the policy, "your work" includes not only work that the insured performs, but also "[m]aterials, parts, and equipment furnished in connection with such work . . . ."  Policy at 11, Sect. V, ¶ 15.  Transportation reasons that because GBA performed work on the Overlake residence, and the residence was damaged as a result, the policy excludes coverage.

The Ninth Circuit's decision in <u>DeWitt</u> disposes of Transportation's contention.  There, the court examined an exclusion for "damage to 'that particular part of any property' that must be repaired or replaced because [the insured's] work 'was incorrectly performed on it.'"  <u>DeWitt</u>, 307 F.3d at 1135.  Applying Washington law, the court construed the exclusion to bar coverage for damage to the specific property on which the insured performed its work, but not to damage to later work that others performed on the insured's work.  <u>Id.</u>  Thus, when the insured's defective concrete piles caused damage to pile caps that another contractor had placed on top of the piles after they were complete, the damage to the caps was beyond the scope of the exclusion.  <u>Id.</u>

Applying <u>DeWitt</u> to this case, at least some of the damage to the Overlake residence is beyond the scope of Exclusion 2(j)(6).  At a minimum, the painting work occurred after GBA plastered the walls.  Thus, any damage to the paint falls outside the scope of Exclusion 2(j)(6).

The court cannot decide, on the record before it, whether Exclusion 2(j)(6) applies to any of the damage to the Overlake residence.  To show that the exclusion applies, Transportation must identify damage to a part of the property that pre-existed GBA's

ORDER – 8

work and on which GBA performed work.  On this record, the court cannot decide as a matter of law whether damage (other than damage to the paint work) is within the scope of Exclusion 2(j)(6), and thus denies summary judgment on this issue.

### b.    Exclusion 2(k)

A different exclusion ("Exclusion 2(k)") bars any recovery for damage to GBA's plaster and other work.  The Transportation policy excludes damage to "'your product' arising out of it or any part of it."  Policy at 3, Sect. I, ¶ 2(k).  The policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed, or disposed of by [the insured.]"  Policy at 10, Sect. V, ¶ 14.  All of the materials that GBA used in installing the plaster are products that GBA "handled," and thus fall within the definition of "your product."  According to Overlake, improperly mixed bonding material that GBA used in its plastering work caused all of the damage at issue.  The bonding material was a "product" that GBA "handled," and it caused damage to other GBA products used in plastering the walls.  The court therefore concludes that any damage to GBA's plastering falls within the scope of Exclusion 2(k).[4]

### 3.    The "Products-Completed Operations Hazard" is Neither a Coverage Nor an Exclusion, and Provides No Basis to Deny Coverage.

Much of Transportation's attempt to avoid liability is focused on the "Products-Completed Operations Hazard" ("PCOH") described in its policy.  The PCOH includes property damage "arising out of 'your product' or 'your work' except [for] . . . [w]ork not yet completed or abandoned."  Policy at 10, Sect. V, ¶ 11(a).  An insured's work is "completed" only after the insured has completed all of the work set forth in its contract,

---

[4]Another exclusion applies to "'Property damage' to 'your work' arising out of it or any part of it . . . ."  Policy at 3, Sect. I, ¶ 2(l).  The court finds that, under the facts of this case, the exclusion's scope is no broader than Exclusion 2(k), and thus the court declines to address it further.

ORDER – 9

or after it has completed all work at a particular site, or after a portion of the insured's work is put to its intended use by someone other than another subcontractor or contractor at the site.  Policy at 10, Sect. V, ¶ 11(b).  When the Transportation policy expired in December 2000, GBA had undisputedly not "completed" its work on the residence within the meaning of the policy.  Transportation reasons, therefore, that GBA did not trigger the "Products/Completed Operations Coverage" during the policy period.  Transportation Mot. at 7.

Transportation misreads the PCOH provisions of the policy.  The "Products/Completed Operations Coverage" does not exist.  The phrase never appears in the Transportation policy.  Although the policy refers to the "Products-Completed Operations *Hazard*" on several occasions, it never indicates that the PCOH defines a coverage.  The PCOH appears as an exception to Exclusion 2(j).  Policy at 3, Sect. I., ¶ 2(j) (noting that Exclusion 2(j)(6) "does not apply to 'property damage' included in the 'products-completed operations hazard'").  It also appears in an exclusion for property damage to "'your work' arising out of it or any part of it and included in the 'products-completed operations hazard'."  Policy at 3, Sect. I., ¶ 2(l).  The PCOH's only other appearance outside of the "Definitions" section of the policy is in the "Limits of Insurance" of Section III:

> Our aggregate limit of liability will be the [policy amount] for "ultimate net loss" arising out of all incidents with respect to the following exposures insured by this policy:
>
> a.   The "Products-Completed Operations Hazard"

Policy at 4-5, Section III, ¶ 2.  This clause does not define a coverage or exclusion, it simply applies a liability limit to three types of "exposures" under the policy, one of which is the PCOH.  The clause does not establish that these three types of exposures are the only exposures that the policy covers.  It does not discuss other types of exposure.  It

ORDER – 10

does not convert the PCOH into a "coverage."[5]  Transportation's attempt to use the non-existent "Products/Completed Operations Coverage" to avoid liability is unavailing.

As stated above, the court concludes that Transportation is liable to Overlake under the policy.  The extent of that liability, however, is impossible to determine from the record before the court.  Among other things, the court must determine the value of covered damages as opposed to damages falling with Exclusions 2(j)(6) and 2(k)[6], to what extent the state court's reasonableness determination binds Transportation, and the proper allocation of damages between Transportation and Mutual of Enumclaw.  Neither the parties' briefing nor the factual record permits the court to address these issues at this juncture.

**B.    The Court Reserves Ruling on Overlake's Bad Faith and CPA Claims.**

The parties also ask the court to determine, as a matter of law, whether Transportation acted in bad faith or violated the CPA when it denied coverage.  A denial of coverage is in bad faith if it is unreasonable, frivolous, or unfounded.  Overton, 38 P.3d at 329-30.  In considering an insurance claim, an insurer must give equal

---

[5]Although it emphasizes Transportation's misuse of the term "coverage," the court's analysis is not semantic.  Even if the court were to accept Transportation's use of the term "coverage" to describe the PCOH, Transportation has no basis for refusing to cover Overlake's losses, because the policy does not obligate Overlake to show that its losses fall within the PCOH coverage.

[6]In its reply brief, Transportation asserted for the first time that under the policy's definition of "ultimate net loss" in its policy, it is not liable for costs or expenses related to litigation or settlement.  Policy at 11, Sect. V, ¶ 18.  Because Overlake had no opportunity to address this contention, the court will not consider it as part of the instant motions.  Transportation may seek to assert that because it did not participate in the state court settlement discussions, it is not bound to pay any portion of the settlement.  See Policy at 11, Sect. V., ¶ 18(a)(2).  The court notes that to the extent that Transportation's refusal to participate in settlement discussions is the consequence of its mistaken denial of coverage, Transportation waived its right to rely on this policy provision.

ORDER – 11

consideration to the insured's interests and its own interests.  Am. States Ins. Co. v. Symes of Silverdale, Inc., 78 P.3d 1266, 1270 (Wash. 2003).  The Washington Administrative Code ("WAC") contains regulations governing the conduct of insurance companies in handling claims, and violation of those regulations is evidence of bad faith.  See Coventry Assocs. v. Am. States Ins. Co., 961 P.2d 933, 935 (Wash. 1998) (citing, inter alia, WAC § 284-30-330).  The CPA may also apply to an insurance company that denies coverage in bad faith.  Overton, 38 P.3d at 330 (citing RCW § 19.86.020); see also Indus. Indem. Co. of the N.W. v. Kallevig, 792 P.2d 520, 530 (Wash. 1990) (holding that a single violation of state insurance regulations is sufficient to support a CPA violation).

The record before the court establishes that neither party conducted itself admirably with respect to GBA's claims.  Overlake offers no explanation for GBA's lengthy delay in seeking coverage from Transportation.  Once GBA sought coverage, CNA delayed in making a coverage determination, and ultimately denied coverage on the basis of the non-existent "Products/Completed Operations Coverage."  Armstrong Decl., Ex. 5.  Moreover, CNA never explicitly denied coverage under the Transportation policy, and instead discussed only the Valley Forge policy in its final denial letter.  Id.  Although Overlake alleges damage arising from this error, GBA never sought a clarification from CNA that likely would have resolved any confusion.

The above paragraph provides only an outline of the parties' allegations regarding bad faith, and the court declines to wade further into the morass at this time.  For the duration of this dispute, the parties have labored under mistaken interpretations of the Transportation policy.  The court has now interpreted the policy, and that interpretation will likely have a substantial impact on the parties' positions.  For that reason, the court will reserve its resolution of the bad faith allegations until July 14, 2006.  In the interim, the court directs the parties to meet and confer to discuss an agreed resolution of their

ORDER – 12

dispute.  By July 14, the parties shall submit a joint pleading informing the court whether they have resolved their dispute, or whether they believe they will be able to resolve their dispute without further action from the court.

### IV.  CONCLUSION

For the reasons stated above, the court GRANTS both parties' motions (Dkt. ## 11, 15) in part and DENIES both in part, but directs the clerk to RENOTE both motions for July 14, 2006 for a resolution of Overlake's bad faith and CPA claims.  The parties shall submit a notification to the court by July 14 in accordance with this order.

Dated this 22nd day of June, 2006.

JAMES L. ROBART
United States District Judge

ORDER – 13